IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:13-CV-642-FL

| | |
|---|---|
| GORDON GRAVELLE, *operating as CodePro Manufacturing*, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| KABA ILCO CORP., | ) ) ) |
| Defendant. | ) |

ORDER

This matter is before the court on the parties' cross-motions for summary judgment, made pursuant to Federal Rule of Civil Procedure 56. (DE 52, 64). Also before the court is defendant's request for a pre-filing injunction, embedded within its memorandum in support of its motion for summary judgment. (DE 52). The issues raised have been briefed fully and are ripe for ruling. For the reasons that follow, the court grants defendant's motion for summary judgment and denies plaintiff's motion. The court denies defendant's request for pre-filing injunction.

**STATEMENT OF THE CASE**

Plaintiff pro se initiated this matter on September 6, 2013. Plaintiff is a sole proprietor operating under the trade name CodePro Manufacturing. Plaintiff, as CodePro Manufacturing, designed and manufactured an electronic key cutting machine, the CodePro 4500. In or around 2011, plaintiff also began to manufacture a second key cutting machine, the RapidKey 7000. Defendant, a limited liability company organized and existing under the laws of North Carolina with

its principal place of business in this state, manufacturers key blanks and key cutting or duplication machines. Plaintiff and defendant have a lengthy history, dating back almost a decade and beginning when defendant purchased from plaintiff the right to manufacture and sell a key cutting machine, now known as the EZ Code.

The instant case arises out of defendant's marketing of the EZ Code machine. In particular, plaintiff claims that defendant falsely labeled two features on its EZ Code machine as "patent pending," despite the fact that defendant never has filed an application for a patent with respect to those features. Plaintiff claims that defendant's false "patent pending" mark has diverted sales away from CodePro Manufacturing. Plaintiff asserts against defendant two federal causes of action for false marking in violation of the Patent Act, 35 U.S.C. § 292; and false advertising in violation of the Lanham Act, 15 U.S.C. § 1125; as well as a state law claim for violation of the North Carolina Unfair and Deceptive Practices Act ("UDPA"), N.C. Gen. Stat. § 75–1.1 et seq.[1]

Defendant filed its motion for summary judgment on December 9, 2015, following a lengthy discovery period. Therein, defendant concedes that it falsely marked the EZ Code as "patent pending." Nevertheless, defendant argues that it is entitled to summary judgment on each of plaintiff's federal claims because he lacks statutory standing under the Patent and Lanham Acts. In addition, defendant also moves for summary judgment on plaintiff's false marking claim on the basis that plaintiff cannot present any evidence of defendant's intent to deceive, and on plaintiff's false advertising claim on the basis that plaintiff cannot establish a likelihood of confusion or actual confusion among consumers. On plaintiff's UDPA claim, defendant contends that plaintiff's claim

---

[1] Plaintiff also sought a declaratory judgment that an arbitration agreement, entered into between himself and defendant, was invalid. The court dismissed plaintiff's declaratory judgment claim on defendant's motion by order entered April 16, 2014.

2

fails for two reasons. First, defendant argues that its false "patent pending" marking was not likely to confuse consumers, which would preclude a finding that its conduct was deceptive. Second, defendant contends that plaintiff cannot satisfy another essential element of his UDPA claim, injury proximately caused by defendant's actions. Along with its motion for summary judgment, defendant argues that plaintiff has a history of filing law suits against it for the sole purpose of harassment and moves the court for a pre-filing injunction.[2]

Following a court order enlarging plaintiff's time for filing dispositive motions, plaintiff filed his motion for summary judgment on January 21, 2016. In support of his motion, and in opposition to defendant's motion, plaintiff submits a single brief. Therein, plaintiff argues that summary judgment is proper as to his first claim because defendant admits that it marked its EZ Code product as "patent pending" when no patent application had been filed. In addition, plaintiff maintains that defendant's admission also supports his Lanham Act claim. Finally, plaintiff also argues that defendant's admission supports his UDPA claim, where such labeling is "deceptive." In response to defendant's statutory standing argument, plaintiff contends that defendant's position is without merit, where he has offered evidence that, in April 2015, he sold the manufacturing rights to the RapidKey 7000 for $20,000.00, materially less than he would have received but for defendant's false

---

[2] In support of its motion for summary judgment, defendant relies on: excerpts from plaintiff's deposition transcript, (Pl.'s Dep., DE 55-1); plaintiff's responses to defendant's first set of requests for production ("RFP"), (Pl.'s RFP Resp., DE 55-2); plaintiff's response to defendant's first set of interrogatories, (Pl.'s Interrog. Resp., DE 55-3); and defendant's responses to plaintiff's first set of requests for admissions ("RFA"), (Def.'s RFA Resp., DE 55-4). In addition, defendant relies on an email from plaintiff to defense counsel, dated October 20, 2015, (Oct. 20 Email, DE 55-5); and a series of emails, one from defense counsel to plaintiff, dated May 21, 2015, and a response from plaintiff to defense counsel, dated May 24, 2015, (May Emails, DE 55-6).

3

"patent pending" mark. Plaintiff repeats this argument with regard to defendant's attack on the "injury" prong of his UDPA claim.[3]

## STATEMENT OF UNDISPUTED MATERIAL FACTS[4]

Plaintiff has been in the business of designing, marketing, and distributing electronic key cutting machines for over 20 years. (Pl.'s Aff. ¶2). Previously, plaintiff was retained by defendant, which also manufactures electronic key cutting machines, to assist in the design of defendant's "EZ Code" key cutting machine. (Id. ¶3). Beginning in or around 2008, defendant began marketing the EZ Code machine as "patent pending" with respect to two features related to the machine's key-cutting function: "automatic blade detection" and "automatic calibration." (See id. ¶¶7–8; see also

---

[3] In support of his motion for summary judgment, plaintiff relies on: defendant's responses to his RFAs, which are substantively identical to defendant's RFA submission lodged in the docket at entry 55-4, (Def.'s RFA Resp., DE 65-1); and defendant's response to his first RFP, (Def.'s RFP Resp., DE 65-2). In addition, plaintiff relies on two emails. Specifically, plaintiff cites an email from plaintiff to Chuck Murray, defendant's general manager, (Murray Email, DE 65-3); and an email from plaintiff to Frank Belflower, defendant's former chief operating officer, and Murray, (Belflower and Murray Email, DE 65-4). Plaintiff also relies on an EZ Code marketing brochure, which includes plaintiff's own notation that it was "obtained from [defendant's] website on September 10, 2013," (EZ Code Brochure, DE 65-5); an EZ Code sales and royalty report, dated December 31, 2015, (EZ Code Royalty Report, DE 65-6); as well as documents published by defendant regarding dealer pricing for the EZ Code machine, from 2008 until present, (DE 65-7). Further, plaintiff relies on several publications regarding the RapidKey 7000, the rights to which were sold to a third party in April 2015. Those documents include: the sales agreement between plaintiff and the purchaser of his rights in the RapidKey 7000, dated April 23, 2015, (Sales Agreement, DE 65-9); a picture of the RapidKey 7000, (RapidKey 7000 Picture, DE 65-10); a magazine article listing the RapidKey 7000 as a "top 2015 electronic key machine," (Magazine Excerpt, DE 65-11); and a photo of the RapidKey 7000 production room and assembly line, taken around February 2012, (DE 65-12). Finally, plaintiff relies on a print out from the P.A.C.E.R. system detailing defendant's involvement in more than 50 law suits, (PACER Report, DE 65-13); as well as his own affidavit, dated January 15, 2016, (Pl.'s Aff., DE 65-14). Plaintiff relies on these same documents in opposition to defendant's motion for summary judgment. (See Pl.'s Br., DE 62).

Plaintiff also relies on the following in response to defendant's motion for summary judgment: a supplement to his affidavit, (Pl.'s Supp. Aff., DE 71); several pieces of marketing material related to the RapidKey 7000, (DE 71-1 through 71-4, 71-6, 71-7, 71-9); additional excerpts from his deposition, (Pl.'s Dep., DE 71-5); and his supplemental responses to defendant's interrogatories, (Pl.'s Supp. Interrog. Resp., DE 71-8).

[4] Defendant submitted a "statement of material facts," (DE 54), to which plaintiff lodged objections. (DE 63). Defendant's "statement of material facts" addresses this case's procedural posture, including plaintiff's conduct during the course of discovery, rather than the material facts at issue in this dispute. As such, the court has gleaned the "undisputed material facts" from the parties' various evidentiary submissions.

4

Def.'s RFA Resp. ¶¶12–17).[5] Defendant used this false marking up to, at latest, September 10, 2013. (EZ Code Brochure; Pl.'s Supp. Aff. ¶12). However, at no point were these features the subject of an application submitted by defendant to the U.S. Patent and Trademark Office. (Def.'s RFA Resp. ¶¶12–17).

In the meantime, plaintiff also sold his own electronic key cutting machines, in direct competition to defendant's EZ Code product.[6] Beginning in 1998, plaintiff owned and operated a sole proprietorship known as CodePro Manufacturing. (Pl.'s Supp. Aff. ¶3). From 1998 until approximately 2014, plaintiff, as CodePro Manufacturing, sold a key cutting machine known as the CodePro 4500. (Id.; see also Pl.'s Dep., 119:1–4).[7] Plaintiff's total sales of the CodePro 4500 fluctuated throughout that time period, ranging from as high as 19 units per year to as low as two

---

[5] At least one of plaintiff's exhibits, the Belflower and Murray Email, belies this contention in part. In particular, part of that exhibit includes an advertisement for the EZ Code, apparently retrieved by plaintiff from defendant's website on or about August 20, 2013. That brochure, with regard to the "patent pending" claim, reads as follows: "The Ilco EZ Code electronic machine cuts traditional automotive and commercial keys by code or duplication. Features include an internal database of codes and cut specifications, patent pending 'Automatic Key Edge Detection' and automatic depth calibration." (Belflower and Murray Email, 3). Given the lack of serial comma in the second sentence of that description, "patent pending" could refer to both "Automatic Key Edge Detection" and "automatic depth calibration." However, given the fact that "patent pending" immediately proceeds "Automatic Key Edge Detection," as well as the fact that the phrase "Automatic Key Edge Detection" is both capitalized as a proper noun and set off in quotations, as compared to "automatic depth calibration," which is neither, the most reasonable construction of that document is that defendant's false "patent pending" mark reached only the "Automatic Key Edge Detection" feature.

[6] Whether plaintiff and defendant were in direct competition is a disputed fact. However, in light of the resolution reached below, the court assumes that the parties were competitors. In any case, certain of plaintiff's evidence, in particular the marketing materials lodged in the docket at entry 71-3, fairly could be read to undermine this assertion. Specifically, that document lists various key cutting machines, including the RapidKey 7000 and EZ Code. It describes the EZ Code as a "code cutting" machine that cuts "edge cut [keys] - single, double, cruciform." (DE 71-3, 3). By contrast, that document describes the RapidKey 7000 as a "code cutting duplicator," that cuts "flat steel, safe deposit, corrugated, paracentric and Mogul [keys], single sided, doublesided." (Id., 4). Although the court does not rely on this document in the statement of the facts, it does seem to undermine plaintiff's assertion that he and defendant were in "direct competition" given the apparent difference in types of keys serviced.

[7] In plaintiff's supplemental affidavit, he avers that he last sold the CodePro 4500 in 2011. However, in his earlier given deposition, plaintiff testified that he last sold that same product in 2014. Given this inconsistency, the court relies only on plaintiff's earlier given testimony. See Grace v. Family Dollar Stores, Inc. (*In re* Family Dollar FLSA Litig.), 637 F.3d 508, 512–13 (4th Cir. 2011) (holding if affidavit inconsistent with prior deposition testimony, the court may disregard the affidavit).

5

units per year. (See id., 120:1–7, 121:8–11). Around 2006, at the apex of the CodePro 4500's sales, plaintiff sold an average of "eight to ten" units per year. (Id., 120:1–2). By 2012, his sales had declined to approximately four machines per year, and in 2013 and 2014 he sold only four machines total. (Id., 121:2–11).

Beginning in 2010, plaintiff began to develop a second electronic key cutting machine, the RapidKey 7000. (See Pl.'s Supp. Aff. ¶¶5, 8.1). The first RapidKey 7000 machine was sold in 2011. (Id. ¶8.1). Plaintiff expended substantial funds in promoting the RapidKey 7000, (see id. ¶12.2), which received positive press attention. (See id. ¶8.5). However, plaintiff's RapidKey 7000 sales lagged behind where he believed they should be. (See id. ¶13). In particular, between 2011 and 2015, plaintiff sold "around 35 or 32" RapidKey 7000 machines. (Pl.'s Dep., 124:2–7). In April 2015, plaintiff entered into a contract to sell the rights to the RapidKey 7000 to a third party for approximately $20,000.00. (Pl.'s Supp. Aff. ¶15; Sales Agreement). As a condition of plaintiff's sale of those rights, he is barred from "engag[ing] in, assist[ing] or hav[ing] any active interest in any business which is competitive with the [buyer]," as either an owner, manager, employer, or employee, among other things, for a period of up to five years. (Id. § 5.01(b); see also id. § 5.01(a) (defining "Restricted Period" as "the lesser of five (5) years from the date hereof or the longest time permitted by applicable law")). Between "October 2014" and September 2015, the RapidKey 7000's purchaser sold "between 50 and 85" RapidKey 7000 machines, but only after expending "probably . . . $30,000.00 in advertising." (Pl.'s Dep., 132:3–5, 13–15).[8]

---

[8] Although the Sales Agreement shows that plaintiff sold his rights in the RapidKey 7000 in April of 2015, at his deposition he testified that the purchaser began selling the RapidKey 7000 some six months earlier, in October of 2014.

6

Plaintiff maintains that the CodePro 4500's declining sales, as well as the RapidKey 7000's poor sales, were a "direct and proximate" result of defendant's marketing materials, which falsely described the EZ Code as having "patent pending" features. (Pl.'s Supp. Aff. ¶13). Plaintiff contends that, but for defendant's false "patent pending" marking, the RapidKey 7000 could have produced revenue for him between $8,000,000.00 and $10,100,000.00 over the life of the machine. (See id. ¶16.2; Pl.'s Supp. Interrog. Resp. ¶¶2, 3). In addition, plaintiff contends that Robert Sylvia, the president of the corporation that purchased the rights to the RapidKey 7000 was "steadfast that his company could sell 1000 Rapid[K]ey 7000 key machines per [year]," for an annual profit of approximately $2,000,000.00. (Pl.'s Supp. Aff. ¶16.2).

Prior to filing suit, plaintiff reached out to defendant, through its general manager and chief operating officer three times, to determine the validity of defendant's "patent pending" claim. (See id. ¶¶9–10). Twice before filing suit, once on October 8, 2008, and again on August 20, 2013, plaintiff reached out to defendant via email; on August 7, 2013, plaintiff called directly defendant's chief operating officer to confront him about defendant's "patent pending" marking. (Id. ¶¶10–11; Murray Email; Belflower and Murray Email). None of these inquires resulted in a direct response. (See Pl.'s Supp. Aff. ¶¶9–11).

## COURT'S DISCUSSION

A.  Standard of Review

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other discovery materials properly before the court demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual

7

dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to find for the non-moving party). When faced with cross-motions for summary judgment, the court must ask "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251; see also Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) ("[T]he court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.") (internal citations and quotations omitted).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250. In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S.654, 655 (1962).

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is

8

warranted where "a reasonable jury could reach only one conclusion based on the evidence," or when "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

B.  Analysis

  1.  False Marking

The parties first move for summary judgment on plaintiff's false marking claim under the Patent Act. Because plaintiff has failed to submit evidence sufficient to demonstrate a "competitive injury," as is required by 35 U.S.C. § 292(b), he lacks statutory standing under the Patent Act. Accordingly, the court grants defendant's motion for summary judgment and denies plaintiff's motion for the same.

The false marking statute, as relevant here, prohibits 1) the use of the words "'patent pending' . . . when no application for patent has been made . . . [2)] for the purpose of deceiving the public." 35 U.S.C. § 292(a); Forest Grp., Inc. v. Bon Tool Co., 590 F.3d 1295, 1300 (Fed. Cir. 2009). To bring suit for false marking, plaintiff must have "suffered a competitive injury as a result of [defendant's false marking]." § 292(b). A "competitive injury" is a "'wrongful economic loss caused by a commercial rival, such as the loss of sales due to unfair competition.'" See Sukumar v. Nautilus, Inc., 785 F.3d 1396, 1400 (Fed. Cir. 2015) (quoting Black's Law Dictionary (9th ed. 2009)). In other words a "competitive injury" is a "disadvantage in the ability to compete." Id. (internal quotations omitted). However, to suffer a "disadvantage in the ability to compete,"

9

plaintiff must have had "some present ability to compete." Id. A lack of a "competitive injury" deprives plaintiff of statutory standing to sue. See id. at 1402.

Based on the evidence submitted in this case, plaintiff lacks a competitive injury. Plaintiff has submitted no documentary evidence to substantiate his claim that defendant's admittedly false "patent pending" marking harmed his business. (See Pl.'s RFP Resp. ¶¶3, 8, 9, 12, 13, 16, 17; Pl.'s Interrog. Resp. ¶2 (indicating plaintiff seeks statutory damages); Pl.'s Supp. Interrog. Resp. ¶¶2–3 (asserting plaintiff seeks $8,000,000.00 to $10,100,000.00 in damages)). (Compare DE 54, ¶¶ 2–4; with DE 63, ¶¶2–4).[9] Moreover, the evidence of record fails to establish a "causal connection" between defendant's use of the false mark and plaintiff's alleged injury. See Cot'n Wash, Inc. v. Henkel Corp., 56 F. Supp. 3d 613, 624–25 (D. Del. 2014); see also Liggett Grp., Inc. v. Brown & Williamson Tobacco Corp., 748 F. Supp. 344, 360 (M.D.N.C. 1990) (requiring a "causal connection between . . . price discrimination in violation of the [Sherman] Act and the injury suffered").[10]

As an initial matter, although plaintiff testified that his "CodePro" line of machines had low sales numbers for the years 2013–14, as well as the year 2012, (see Pl.'s Dep., 118:18–121:20), plaintiff's testimony of poor sales, standing alone, is not evidence of a competitive injury. In addition, viewing plaintiff's CodePro 4500 sales both before defendant's use of the false mark in 2008 and thereafter, there is no evidence to support a reasonable inference that plaintiff's alleged competitive injury is traceable to defendant. In 2006, plaintiff was selling "maybe eight to ten

---

[9] Plaintiff initially indicated that he sought statutory damages under 35 U.S.C. § 292 (2006), which authorized qui tam suits against offenders on behalf of the United States. Realtors were entitled to recover up to $500.00 for "every such offense," with one-half of the total recovery owed to the United States. Id. However, the qui tam provision of the false marking statute was repealed in 2011. See 35 U.S.C. § 292 (2012). Because of the 2011 amendments, private parties, who previously could have sued to recover statutory damages, now may recover the entire amount of loss suffered by such party as a result of "competitive injury." Id.

[10] In Sukumar, the Federal Circuit likened the "competitive injury" requirement to the concept of "injury to competition" under antitrust law. See 785 F.3d at 1401.

10

[CodePro 4500] machines a year." (See id., 119:25–120:2).[11] By 2012, his sales had declined to approximately four machines, and in 2013 and 2014 he sold an average of two machines per year. (Id., 121:2–11). As such, plaintiff suffered only an insubstantial decline in sales. There is no evidence connecting that insubstantial decline in the CodePro 4500's sales to defendant's use of the false "patent pending" mark. Rather, other evidence of record reasonably explains the decline. For example, as of 2009 the CodePro 4500 was an aging product, where it had been available since at least 1999. (See Pl.'s Br., 5) (market life span of product 10–15 years). Moreover, during the relevant time period plaintiff diluted his own market share with the introduction of another key cutting machine, the RapidKey 7000. (See Pl.'s Dep., 118:13–16; see also Pl.'s Aff. ¶5).[12]

In addition, plaintiff's own evidence undermines his claim that defendant's misuse of the "patent pending" mark negatively impacted the sales or earning potential of the RapidKey 7000. Plaintiff's claim that the RapidKey 7000 could have earned him $8,000,000.00, or more, over the life of that machine is "based upon [the] conservative [estimate] of (12) units being sold per month." (Pl.'s Supp. Interrog. Resp. ¶2). However, sustained monthly sales projections of 12 units is incongruent with plaintiff's claimed experience of marketing and selling a similar product, the CodePro 4500. For example, at his deposition plaintiff testified that he sold, at most, 19 CodePro 4500 units in a single year. Plaintiff's assertion that he expected to sell per year an additional 125

---

[11] There is evidence that plaintiff's sales, at one time, may have been as high as 19 machines in one year. (See Pl.'s Dep., 120:1–7). However, there is insufficient context from which to infer that plaintiff's sales ever sustained that level of success. In addition, there is insufficient context to suggest that plaintiff's sales were so high in the years 2006 and 2007, immediately before defendant's first use of the false mark. The court is unwilling to speculate on that point.

[12] Although, arguably, the RapidKey 7000 and CodePro 4500 were not aimed at the same market, where the former apparently had drastically improved technology, the court herein considers them to be part of the same market. Were the court to consider the machines to be in different markets, it would render inapt plaintiff's claims of competitive injury to his RapidKey 7000 intellectual property rights arising from the EZ Code's false marking, where the EZ Code and CodePro 4500, a much older machine, were also competitors.

11

units of his new, but similar, product, an increase in annual sales of approximately 650% over his previously most successful year, is not plausible and, thus, does not merit credit at summary judgment.

In any case, at least two other inferences drawn from the evidence of record belie plaintiff's claim that defendant's use of the false "patent pending" mark negatively affected his profits. First, the evidence clearly shows that defendant's sales of the EZ Code also declined around 2012, the same time the CodePro 4500 experienced a decline in sales. (See EZ Code Royalty Report). Although numerous explanations may suggest why plaintiff and defendant both experienced declining sales, defendant's decline in EZ Code sales, concurrent with plaintiff's decline in the CodePro 4500's sales, suggests that plaintiff's decline in sales was not brought about by defendant's product consuming an increased percentage of market share. Second, the fact that the purchaser of the RapidKey 7000's intellectual property rights believed that the RapidKey 7000 could produce for it approximately $2,000,000.00 in yearly profits suggests that defendant's use of the false "patent pending" mark is not the source of plaintiff's injury. Had defendant's use of the false "patent pending" mark been the source of plaintiff's depressed earning potential, it is reasonable to expect that effect to be felt industry wide, especially given the fact that patent rights are tantamount to monopoly rights.

Moreover, on the facts of this case, plaintiff's claim that the purchaser of the RapidKey 7000's intellectual property rights expended approximately $30,000.00 for the purpose of "undoing" defendant's false marking is speculative and is not entitled to credit at summary judgment. (See Pl.'s Dep., 132:20–25) ("Q: Did [the purchaser] say anything generally that indicates that they spent the – they spent marketing money to, as you put it, undo my client's [false marking]? A: No. But

12

I – they did say specifically – or in generally – or specifically that, you know, false marketing is very hard to overcome."). Irrespective of what effect such a claim may have in the ordinary case, here, there is no other credible evidence that suggests defendant's false marking played a role in affecting the price of the RapidKey 7000's intellectual property rights. In any case, even though the purchaser spent $30,000.00 in advertising expenses, in light of the fact that the purchaser expected a profit of approximately $2,000,000.00 annually, that fact is not indicative of any harm done by defendant's false marking. Rather, that relatively minimal initial expenditure more fairly is characterized as an ordinary investment in marketing with an eye toward expanded sales. Likewise, the court does not view the RapidKey 7000's increased sales, following plaintiff's sale of his intellectual property rights in the machine, to be indicative of any competitive injury suffered by plaintiff.

Notwithstanding the above, plaintiff contends that he has suffered a competitive injury, and thus that he has statutory standing, where he was "forced" to sell the rights to his RapidKey 7000 machine for $20,000.00 when the intellectual property rights associated with that product were worth in excess of $8,000,000.00. The court does not find this inference plausible. Certainly plaintiff has submitted evidence that his rights in the RapidKey 7000 were sold for $20,000.00. (See Sales Agreement). However, plaintiff has submitted nothing outside of his bald speculation that the intellectual property rights associated with the RapidKey 7000 actually were worth in excess of $8,000,000.00. As an initial matter, the sales necessary to achieve an $8,000,000.00 profit over the life of the RapidKey 7000, 12 units per month, is grossly disproportionate to any level of sales plaintiff has achieved with similar products in the past, even before defendant began falsely marking the EZ Code as "patent pending." In addition, although the buyer of the RapidKey 7000's intellectual property rights opined that the product would generate for it approximately

13

$2,000,000.00 in annual revenues, that fact alone is not sufficient to substantiate plaintiff's claimed injury. Moreover, and perhaps more importantly, the fact that the purchaser of the RapidKey 7000's intellectual property rights was so optimistic regarding its future earning potential severely undermines plaintiff's assertion that he was "forced" to sell his invention for such a paltry sum. This is especially true in light of the fact that plaintiff sold the RapidKey 7000's intellectual property rights more than one year after defendant stopped using the false "patent pending" mark. Thus, the court is unwilling to credit plaintiff's speculative assertion that the RapidKey 7000 would have earned him $8,000,000.00 over the life time of the machine, or, indeed, that he could have sold the RapidKey 7000's intellectual property rights for more than $20,000.00, but for defendant's use of the false mark.

In sum, because plaintiff has not presented any evidence sufficient to support the inference that defendant caused him a competitive injury, the court grants defendant's motion as to plaintiff's 35 U.S.C. § 292 claim.

    2.        False Advertising

The parties next move for summary judgment on plaintiff's false advertising claim under the Lanham Act, 15 U.S.C. § 1125(a). Again, plaintiff has failed to demonstrate damages proximately caused by defendant's conduct, and thus lacks statutory standing; accordingly, the court grants defendant's motion.

The Lanham Act prohibits the "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of . . . goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). The Lanham Act imposes upon the false advertiser civil liability to "any

14

person who believes that he or she is or is likely to be damaged by such act." Id. To have statutory standing to sue under the Lanham Act, "plaintiff must allege an injury to a commercial interest in reputation or sales." Lexmark Int'l, Inc. v. Static Control Components, Inc., __ U.S. __, 134 S. Ct. 1377, 1387 n.4 & 1390 (2014). In addition, plaintiff also must allege that defendant's false advertising proximately caused a loss in business. Id. at 1390–91. In other words, plaintiff must demonstrate that his sales were damaged and that such damaged flowed "directly from the deception wrought by . . . defendant's advertising." Id. at 1390–91.

As discussed above, plaintiff has not demonstrated harm to his sales, at least with respect to the RapidKey 7000. More importantly, plaintiff has not demonstrated that defendant's use of the false "patent pending" mark proximately caused him any harm. Although plaintiff's sales, with respect to the CodePro 4500, did suffer, he concedes that the CodePro 4500 was nearing the end of its life span. Moreover, plaintiff placed an additional, competing machine in the market. Plaintiff's decline in sales, with respect to the CodePro 4500, as well as the allegedly depressed value of the RapidKey 7000's intellectual property rights, fairly may be attributed to plaintiff's dilution of his own market share. Thus, for the reasons discussed in the court's analysis of plaintiff's false marking claim, the court also grants defendant's motion for summary judgment as to plaintiff's false advertising claim.

Plaintiff argues that he has statutory standing to bring his Lanham Act false advertising claim where the Lanham Act allows a successful plaintiff to disgorge the defendant's profits. See 15 U.S.C. § 1117(a). In other words, plaintiff contends that he should be allowed to sue, notwithstanding the fact that he cannot demonstrate that his injury was proximately caused by defendant's false "patent pending" mark, because he ultimately could recover damages in the form

of defendant's profits. Plaintiff's argument overlooks the fact that injury and damages are separate inquiries under the Lanham Act and that, without the former, there can be no entitlement to the latter. Thus, the mere fact that the Lanham Act establishes a mechanism by which plaintiff could recover damages, were he successful, does not mean that plaintiff has suffered an injury proximately caused by defendant's conduct, sufficient to support a claim under the Act.

3. UDPA

The parties move for summary judgment on plaintiff's UDPA claim. Because plaintiff has not submitted evidence sufficient to demonstrate that he suffered an injury proximately arising from defendant's false use of the "patent pending" mark in its advertisements, the court grants defendant's motion and denies plaintiff's motion.

The UDPA provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75–1.1(a). To succeed on a claim under the statute plaintiff must prove 1) an unfair or deceptive act or practice 2) in or affecting commerce, 3) that proximately caused his injury. Bumpers v. Cmty. Bank of N. Va., 367 N.C. 81, 88 (2013). For all the reasons set forth above, plaintiff has failed to demonstrate that any loss of business, sales, or value of intellectual property proximately was caused by defendant's false use of the "patent pending" mark in its advertisement. Accordingly, defendant's motion is granted.

C. Pre-Filing Injunction

Defendant moves for a pre-filing injunction. The court maintains the authority under the All Writs Act, 28 U.S.C. § 1651, in extreme or "exigent" circumstances, to limit access to the courts by certain litigants. Cromer v. Kraft Foods N. Am., Inc., 390 F.3d 812, 817–18 (4th Cir. 2004). In

16

particular, a pre-filing injunction is warranted where "a litigant[] continuous[ly] abuse[s] . . . judicial process by filing meritless and repetitive actions."  Id.  However, the "use of such measures against a pro se plaintiff should be approached with particular caution and should remain very much the exception to the general rule of free access to the courts."  Id. (internal quotations omitted).  "In determining whether a pre-filing injunction is substantively warranted," this court is required to

> weigh all the relevant circumstances, including (1) the party's history of litigation, in particular whether he has filed vexatious, harassing, or duplicative lawsuits; (2) whether the party had a good faith basis for pursuing the litigation, or simply intended to harass; (3) the extent of the burden on the courts and other parties resulting from the party's filings; and (4) the adequacy of alternative sanctions.

Id. at 818.  In all cases, the court must narrowly tailor any injunction to fit the specific circumstances justifying the injunction.  Id.

Here, the court does not find that exigent or exceptional circumstances compel such a drastic remedy as the entry of a pre-filing injunction against a pro se plaintiff.  Defendant represents that plaintiff has a history of filing harassing law suits and highlights certain testimony given by plaintiff at his deposition in this matter.  Although the court finds that plaintiff has a long history of litigiousness, it is not shown on the basis of defendant's submissions that those lawsuits were duplicative, harassing, or vexatious.  In addition, in its April 14, 2014, order, the court found that plaintiff's initiation of the instant suit against defendant did not justify imposition of a pre-filing injunction, notwithstanding the parties' history of litigation.  See generally Gravelle v. Kaba Ilco Corp., No. 5:13-CV-160 (E.D.N.C.).  Accordingly, the court declines to enter a pre-filing injunction against plaintiff.

17

## CONCLUSION

Based on the foregoing, the court GRANTS defendant's motion for summary judgment (DE 52) and DENIES plaintiff's motion for summary judgment. (DE 64). The court DENIES defendant's request for pre-filing injunction. (DE 52). The clerk of court is DIRECTED to close this case.

SO ORDERED, this the 9th day of May, 2016.

_____
LOUISE W. FLANAGAN
United States District Judge